## Case No. 5,267.
### The GATE CITY.
[5 Biss. 200.] [1]
District Court, N. D. Illinois. Aug., 1872.

CAPTAIN HAS NO LIEN—SERVICES AS CLERK—EFFECT OF SALE OF CLAIM—BOAT USED FOR FERRY —EFFECT OF FERRY FRANCHISE — WAIVER OF MARITIME LIEN.

1. It being a well-established rule in admiralty that the contract of a captain is personal, and that he has no lien for his services, he cannot maintain a libel for additional services as clerk or manager without showing a special contract designating the extra compensation to be paid him as such.

2. The lien of a mariner is strictly personal, and if he reduce it to a common law judgment, which he sells, no libel can be maintained thereupon, either by himself or for the benefit of the assignee.

3. A vessel plying between several points on the Mississippi river, on opposite sides, and within a distance of six miles, is amenable to the admiralty, even though her main business be that of a ferry-boat between points on opposite sides of the river.

[Cited in Murray v. The F. B. Nimick, 2 Fed. 90; The Ella B., 24 Fed. 508; The St. Louis, 48 Fed. 313.]

4. The fact that such boat was owned and run by a company possessing a ferry franchise does not change the character of the service.

5. The width of a stream or length of a voyage is no criterion by which to determine the character of the service, nor the question of admiralty jurisdiction.

6. A mariner's lien will not be considered as waived by anything less than an express contract. Attaching the vessel under a state law, and settling that proceeding on receiving notes secured by a mortgage on the vessel, which afterwards become worthless, does not constitute a waiver of the maritime lien. A libel may still be sustained, and the decisions as to waiver of liens under state statutes are not applicable.

[Cited in Starke v. The Napoleon, Case No. 10,011; The Cerro Gordo, 54 Fed. 395.]

[See The Active, Case No. 34.]

In admiralty. Libel for mariner's wages, filed by Daniel McFarlane, W. H. Thomas, Jno. O. Butler, Joshua Edginton and Philip Coonrod, setting forth in substance, that they were respectively "seamen on board the Gate City, of which the said Coonrod was master; that the said steamboat is a vessel of more than fifty tons burthen, was duly enrolled and licensed, and engaged in the business of commerce and navigation upon the waters of the Mississippi river, bordering upon the states of Illinois and Iowa, which said waters were navigable from the sea by vessels of more than ten tons burthen; that during the season of the year 1870–71, while said steamer was so engaged upon the waters aforesaid, the said libellants were duly engaged to render service as mariners in running and navigating the said steamer upon the waters aforesaid, and, in pursuance of the engagement aforesaid, did render such service during the season aforesaid; that the said services were rendered by Butler and Mc-

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

Farlane in the capacity of engineers of said steamer, said Edginton served as fireman, Thomas as pilot, and Philip Coonrod served as clerk and general manager of said boat." The hearing of the case shows that there was due the libellant Butler, for his services as pilot, the sum of $35; to McFarlane for his services as engineer, $275.40; to Thomas for his services as engineer, the sum of $251.45; that there remains unpaid to Edginton the sum of $32.45; that Coonrod, the other libellant, while he claimed in the libel for services as clerk and general manager of the boat, was, in point of fact, the captain.

BLODGETT, District Judge. Though Coonrod may have acted as captain of the boat, it is impossible to distinguish between the services which he rendered as captain and the services which he rendered as clerk or general manager, so far as his compensation is concerned.

It being a well established rule in admiralty that the captain or master of a ship has no lien for his wages, but that his contract is personal with the owner of the boat, the court cannot, either upon the libel as it stands, or the testimony, decide the compensation due to the master and allow him a lien in admiralty for what may be his fair compensation for the services rendered as clerk. If he performed the duties in both capacities, he should either have made a contract designating what he was to be paid as captain and how much extra as clerk, or he must be content to abide by the rule in admiralty and take his pay for all the services performed in capacity of captain alone and forego his lien.

So far as the libellant Edginton is concerned, the proof shows that he received a due-bill for the balance due him, on which he obtained a judgment, which he afterwards, and sometime prior to the filing of this bill, sold to Ebyard & Derano of Keithsburg.

The proof, being that of the libellant himself, is conclusive that he had no interest in this claim for wages at the time this suit was brought, and it is noticeable that while all the other libellants sign the libel and verify it, the name of Edginton does not appear upon the libel, either in the signing or verification. I, therefore, have no doubt but what this claim was properly assigned by Edginton to the parties named, and that he has parted with all his rights, and that this suit cannot be maintained, even in Edginton's name, for the benefit of these parties, the maritime lien being personal to the mariner and not being assignable to other parties, especially after he has had recourse to a common law court and obtained a judgment on it.

The proof also shows that McFarlane and Thomas performed services in their respective capacities, upon the boat, to the amount of the claims set up in the libel respectively,

that is to say, $275.40 for McFarlane, and $251.45 for Thomas.

The defense set up against the recovery of these claims is twofold.

First: That the steamer Gate City was nothing but a ferry-boat, and that a court of admiralty has no jurisdiction over the transactions of a boat merely engaged as a ferry-boat; that a maritime lien for wages does not attach to a boat engaged in such service.

The evidence shows that this steamer was employed in the transportation of passengers and freight between Keithsburg, in the county of Mercer in this state, and the opposite shore of Iowa, touching at various points upon the Iowa shore, ranging from three miles above Keithsburg to the same distance below, according as the stage of water or the business made it desirable to touch at one or the other point or the point directly opposite, the boat having, according to the proof, some five different landing points on the western bank. The vessel is above twenty tons burthen, and is enrolled and licensed to carry on the ferry, freight and towing business.

There is no doubt but what her tonnage, her equipment and her outfit, in every particular, was such as to bring her within admiralty jurisdiction. The only question is, whether the business in which she was employed was such as is contemplated by the law governing the transaction of maritime business.

The proof shows that the vessel was mainly employed as a ferry-boat—that is, in the transportation of persons and teams between the opposite sides of the Mississippi river; that she also touched at various islands in the river, from which she took wood and hay to Keithsburg, if not to the Iowa shore; that she also brought grain across the river from the Iowa side for transportation on the railroad which terminates at Keithsburg and runs thence east to some point on the Chicago, Burlington & Quincy road. She therefore plied between the ports of different states. The particular manner in which she transported her passengers and freight, and the length of her voyages, it seems to me, can make no difference, so far as the maritime character of the business is concerned. The question naturally suggests itself, how wide must a stream of water be across which a ferry-boat must pass in order to divest it of the character of a ferry-boat, contended for by the counsel for respondent, in contra-distinction to the maritime service alleged by the libellants? In one sense of the word, the Cunard Line of steamers consists but of ferry-boats, running from Liverpool to New York. They make regular trips on advertised schedules and transport freight and passengers from shore to shore. So, too, take the boats plying between this port and ports upon the opposite side of Lake Michigan. They make regular trips, and, in one sense, are but ferry-boats, and yet no one has ever denied that their business was maritime; and the mere fact that this boat was owned by a company possessing a ferry franchise from the states of Illinois and Iowa, authorizing them to maintain a ferry across the Mississippi river at that point, does not, as it seems to me, change the character of the service. An individual or corporation may be invested with a ferry franchise for the purpose of public convenience, by the state authorities, but when they use, for the purpose of exercising that franchise, a boat which comes within the definition and character which makes it amenable to the maritime laws, then the fact of the ownership of the boat and of the ownership of the right to perform the service in which the boat is engaged does not take from the admiralty courts jurisdiction over the boats, or remove those engaged in it from the protection of the admiralty courts. It seems to me that the width of a river or the length of the voyage makes no difference; it is no criterion by which to determine the character of the service.

I have, therefore, no doubt but what this boat, although performing numerous voyages every day, was, at the same time, engaged in such maritime occupation and business as makes her amenable to the admiralty law and the jurisdiction of the admiralty courts.

Second: The second point made by respondents is, that these libellants, sometime in the month of July, 1871, caused this steamboat to be attached by a writ of attachment, issued out of the circuit court of Louisa county, in the state of Iowa, upon the debt alleged to be due the attaching creditors respectively from the alleged owners of the boat, to wit: David Lloyd and Mrs. Coonrod; that the boat was held under this attachment for several days by the sheriff of Louisa county, when, as he testifies, he was directed by the attorney of the attaching creditors to release the boat and return his writ with an indorsement that the release was made by direction of the plaintiffs, which he did, and the record in the attachment case thus commenced, shows that the case was settled and dismissed. It further appears that, while the boat was held under this attachment, an agreement or arrangement was entered into between the attaching creditors and Cabeen & Elliot, who were merchants in Keithsburg, by which it was stipulated, or understood, that the owner of the boat should make a mortgage to Cabeen & Elliot for an amount sufficient to cover this indebtedness, and that Cabeen & Elliot should pay the amount that was due these libellants, together with other creditors, and that these attachment suits were dismissed by reason of this arrangement which was made for the giving of this chattel mortgage. It appears, further, that the boat, during the time these services were rendered,

was owned by Lloyd and Mrs. Coonrod in about the proportion of two-thirds to Lloyd and one-third to Mrs. Coonrod; that Lloyd had given a mortgage upon his interest in the boat to one John C. Pepper, to secure the payment of $150 and that he had given a further mortgage to Mrs. Griswold, to secure the payment of $100; that at about the time this attachment was levied, Pepper had proceeded to foreclose his mortgage, and had put some person on board the boat, ostensibly as keeper or custodian for him, but there is no evidence that Mrs. Coonrod or these attaching creditors had any knowledge or notice that this person was on board in any such capacity. After the boat was released from the attachment in Iowa and came over to Keithsburg, Mrs. Griswold purchased from Pepper Lloyd's interest in the boat, under a clause in the mortgage which authorized the mortgagee, in case of the non-payment of the mortgage debt, to sell the boat at either private or public sale, and the evidence is very conclusive to show that this was a secret purchase, made under such circumstances as go to show that there was collusive action between Lloyd, Pepper and Mrs. Griswold, with the intent of defeating this chattel mortgage which had been given to secure the libellants' wages and the amounts due them respectively. After this pretended purchase by Mrs. Griswold, a writ of replevin was issued from the Mercer county circuit court in her favor and executed, by which an attempt was made to place the boat in the hands of Mrs. Griswold under her assumed title. In consequence of these proceedings on the part of Mrs. Griswold, Cabeen & Elliot, the mortgagees, entirely refused to carry out the arrangement which had been made for the payment of the wages and other sums which had accrued against the boat; and the boat, at the time this libel was filed, was nominally in the possession of Mrs. Griswold, although her possession was resisted, and both parties seemed to have had captains or agents on board to represent their respective rights and interests.

Upon this state of facts, it is urged very strenuously by counsel for the respondents and intervening owner, that the maritime lien has been waived. I am cited to numerous authorities in this state and in the state of Missouri, to show that the taking of any other security, or the resorting to the state courts, waives the maritime lien of a seaman, but an examination of those cases shows that they were all cases where the question was not as to the general maritime lien, but upon the question of a lien created by the statute of the respective states—what are known as "statutory liens" under the boat and vessel acts of the states—which have always been treated by the admiralty courts as standing on a widely different footing from the admiralty or maritime liens known to the courts of admiralty and enforced through these courts.

The general principle in regard to mariners' wages is, that the mariner is, to a certain extent, the ward of courts of admiralty; that his lien for his wages is under the protection of the courts of admiralty, and that no act on the part of a seaman short of absolute payment, or such an act as shows an intelligent intention to waive his admiralty lien, shall be construed as a waiver of such lien. Courts of admiralty take notice of the improvidence, and the ignorance, and of the guilelessness of seamen, and protect their interests, in view of the liability of such persons to be imposed upon by the more shrewd and experienced persons with whom they may come in contact and deal; and, therefore, it is a settled principle of admiralty law, that a seaman or mariner who has acquired a maritime lien will not be construed as having parted with that lien and waived it by anything short of an express contract or payment.

Here the parties resorted, in the first instance, to the state courts of Iowa for the purpose of enforcing the payment of this indebtedness. They did not get their money by that proceeding, but they did obtain what, at the time, appeared to be an arrangement which would ultimately secure them the payment of their claims. Certain parties stepped forward and took a mortgage on the boat and libellants took the notes of the owner of the boat, which were secured by that mortgage. That act did not waive the maritime lien of the seamen, because they received nothing, and they did not, by express word or act, waive the maritime lien. The mortgage proved unavailing in the hands of the parties to whom it was made, by reason of the changes which took place in the title to the boat, and consequently the seamen or mariners took nothing by the mortgage and notes. They have not yet been paid, and the mortgage does not in terms, nor do the notes, in terms, or by necessary implication, waive the maritime lien. I cannot, therefore, consider the cases which have been cited as in point to sustain the position taken by the respondent's counsel. The case is not one of an attempt to enforce a mere statutory lien under a state law, which may be waived, under the authorities cited from the state courts, by any act which shows that the seaman or person holding the lien has accepted any other security, and I therefore shall overrule all the defenses interposed and direct a decree to be entered in favor of the libellant Butler for $35, McFarlane $275.40, Thomas $251.45, interest to be computed from July 1, 1871. The libel must be dismissed as to Coonrod.

Consult The Fanny Gardner [Case No. 4,642], as to mate's compensation, when acting in capacity of captain.

———

GATE VEIN COAL CO. (DETMOLD v.).
  See Case No. 3,830.

GATES (GOODYEAR DENTAL VULCANITE CO. v.). See Case No. 5,593.